**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PROJECT ON GOVERNMENT** ) <br> **OVERSIGHT, INC.** ) <br> **1100 G St NW** ) <br> **Suite 500** ) <br> **Washington, D.C. 20005,** ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **U.S. DEPARTMENT OF JUSTICE** ) <br> **OFFICE OF LEGAL COUNSEL** ) <br> **950 Pennsylvania Ave., NW** ) <br> **Washington DC, 20530-0001** ) <br> ) <br>     **Defendant.** ) <br> ) | **Case No: 20-01415** |

## <u>COMPLAINT</u>

Plaintiff, Project On Government Oversight ("POGO"), brings this action against the

Defendant, U.S. Department of Justice, Office of Legal Counsel ("OLC") under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§

2201 and 2202, seeking declaratory and injunctive relief to compel compliance with the

requirements of FOIA, including immediate release of records requested by POGO.

## I.  INTRODUCTION

1.  POGO asserts violations of FOIA by OLC for failing to respond to certain of POGO's
requests.

2.  POGO asserts violations of FOIA by OLC for failing to provide responsive
documents concerning various matters involving OLC.

3.   From October 2018 to January 14, 2020, POGO filed various FOIA requests with OLC.

4.   The following five FOIA requests submitted to OLC are the subject of this action:

| Date | Requestor | Subject | Exhibit |
|------|-----------|---------|---------|
| October 1, 2018 | Daniel Van Schooten | Comprehensive list of all opinion titles since 1998 | A |
| November 9, 2018 | Daniel Van Schooten | The appointment of Matthew Whitaker | B |
| November 29, 2018 | Daniel Van Schooten | The use of armed forces to support U.S. Customs and Border Patrol ("CBP") | C |
| June 11, 2019 | Mandy Smithberger | OLC transparency, specifically constitutional separation of powers over foreign affairs and the president's authority to provide military equipment | D |
| January 14, 2020 | Jake Laperruque | Soleimani strike | E |

5.   These requests have resulted in either incomplete productions, or no production whatsoever.

6.   FOIA requires OLC to respond within 20 business days, excluding Saturdays, Sundays, and legal holidays. OLC has not requested any extensions of time to process these requests, nor have they offered any explanation to their lack of communication about certain of the requests.

7.   POGO seeks a declaration that OLC violated FOIA by failing to disclose all responsive records by the statutory deadline and an injunction ordering OLC to produce all non-exempt, responsive records by a date certain, without further delay.

## II.    JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§

552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28

U.S.C. §§ 1331, 2201(a), and 2202.

9.   Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §

1391(e).

## III.    PARTIES

10. Plaintiff POGO is a nonpartisan independent organization based in Washington, DC

organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO

champions reforms to achieve a more effective, ethical, and accountable federal government that

safeguards constitutional principles. POGO's investigators and journalists take leads and

information from insiders and verify the information through investigations using FOIA,

interviews, and other fact-finding strategies. POGO's investigative work has been recognized by

Members of Congress, executive branch officials, and professional journalism organizations. For

instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award , the Society of

Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for

reporting on the Department of Justice's opaque system for handling allegations of attorney

misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing

Business Editing & Writing for its investigative series scrutinizing the government's oversight of

offshore drilling. POGO extensively used records obtained under FOIA for this investigation.

11. Defendant OLC is an office of the Department of Justice ("DOJ"), a federal agency

within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and headquartered in Washington, DC. OLC

has possession, custody, and control of the records POGO seeks in this action.

## IV.     FREEDOM OF INFORMATION ACT

12. FOIA requires federal agencies, upon request, to make records "promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

13. The agency must provide the public records when they are requested by the public, in order "to ensure an informed citizenry, vital to the functioning democratic society." *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

14. An agency must determine whether to comply with a FOIA request within twenty business days and "shall immediately notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i); *see also* 15 C.F.R. § 4.6(b).

15. The twenty-day deadline for an agency to determine whether to comply with a request begins on the earlier of: l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

16.  In unusual circumstances, the time limits prescribed may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

17. If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

## V.      BACKGROUND AND PUBLIC INTEREST IN THE RECORDS SOUGHT

### i.      The Office of Legal Counsel

18. In 1789, Congress created the position of Attorney General, a person "learned in the

law" who would:

> be sworn or affirmed to a faithful execution of his office; whose duty
> it shall be to prosecute and conduct all suits in the Supreme Court in
> which the United States shall be concerned, and to give his advice
> and opinion upon questions of law when required by the President
> of the United States, or when requested by the heads of any of the
> departments, touching any matters that may concern their
> departments[.]

Judiciary Act of 1789, ch. 20, §35, 1 Stat. 73, 93.

19. OLC was created in 1934 by Congress as part of an executive branch reorganization

that involved executive branch administrative agencies and the Department of Justice.[1]

20. OLC exercises the Attorney General's authority under the Judiciary Act of 1789 to

provide the President and executive agencies with advice on questions of law.  28 U.S.C. §§ 511-

513.

21. According to the OLC website, "[b]y delegation from the Attorney General, the

Assistant Attorney General in charge of the Office of Legal Counsel provides legal advice to the

President and all executive branch agencies." *See* www.justice.gov/olc excerpt, attached hereto

as Exhibit F.

22.  OLC prepares the formal opinions of the Attorney General, renders opinions to

various federal agencies, assists the Attorney General in the performance of his function as legal

---

[1]      OLC's original name was the Office of Legislative Counsel , and it was initially led by an
assistant solicitor general until 1951 when then Attorney General J. Howard McGrath made it a
division led by an assistant attorney and named it the Executive Adjudications Division. The
name was subsequently changed to Office of Legal Counsel in an April 3, 1953 administrative
order by Attorney General Herbert Brownell Jr.

adviser to the President, and provides opinions to the Attorney General and the heads of the

various organizational units of the Department of Justice. 28 C.F.R. § 0.25.

23. OLC reviews all proposed orders of the Attorney General and regulations that require

approval from the Attorney General, in addition to a variety of special assignments referred by

the Attorney General or the Deputy Attorney General.

### ii.        OLC Published Opinions

24.  The OLC web site includes opinions that it has determined are appropriate for

publication.

25. In addition to publishing its opinions online, the OLC publishes its opinions in

traditional book series.

26. Volumes 1-32 of the primary book series, Opinions of the Office of Legal Counsel,

contain the official versions of opinions for the years 1977 to 2008 and are available on the OLC

website in PDF form.

27. The purposes of the supplemental series are to fill gaps in the historical record and to

make available materials that may not have been appropriate to release publicly when issued to

the client but with the passage of time have become publishable.

### iii.        OLC's List of Memorandums

28. Although OLC generally claims its records are privileged, consistent with then

President Obama's Memorandum on Transparency and Open Government, as well as Attorney

General Eric Holder's 2009 FOIA memorandum, OLC sometimes proactively publishes legal

opinions in its online database. *See* February 24, 2009 President Obama Memo, attached hereto

as Exhibit G; *see also* 2009 Attorney General Holder memo regarding FOIA, attached hereto as

Exhibit H.

29. It also sometimes publishes records requested under FOIA in its separate Electronic Reading Room, even if the office claims they fall within the scope of a FOIA exemption or have not been the subject of a FOIA request. *See* https://www.justice.gov/olc/olc-foia-electronic-reading-room, attached hereto as Exhibit I.

30. The 2019 OLC production pursuant to a POGO FOIA request (FY19-001) was heavily redacted pursuant to Exemptions (b)(5) [2] and (b)(6)[3]. Exhibit J.

31. However, "[t]he list also reveals when memos with redacted titles were issued—and in some cases reveals the dates and authors—which is a small but significant step that makes it easier to keep track of them." [4] *See* List of Opinions, attached hereto as Exhibit K; *see also* May 20, 2019 POGO Article, at p. 3, attached hereto as Exhibit L.

32. By using the unredacted issuance dates, POGO was able to conclusively determine that the 2019 OLC production was not simply over-redacted, but significantly incomplete. Exhibit L, pp. 1-2.[5]

33. At least 41 memos available on either the OLC's online database or its Electronic Reading Room were not included on the list provided to POGO, although 3 may be included but redacted. In addition, the listed dates for several memos in the OLC's production differ from

---

[2]      Exemption (b)(5) applies to inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested. 5 U.S.C. §552(b)(5).

[3]      Exemption (b)(6) applies to personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. §552(b)(6).

[4]      Until POGO's appeal on a separate FOIA request in 2019, OLC did not release the dates or authors of redacted entries, making it nearly impossible to keep track of them.

[5]      Pursuant to a successful administrative appeal by POGO, the Department of Justice remanded POGO's request to OLC for additional responsive records. *See* Remand Letter, attached hereto as Exhibit M. OLC replaced their previous list of published OLC opinions since 1998 with this resulting release of records.  *See* https://www.justice.gov/olc/olc-foia-electronic-reading-room.

what is stated on other parts of the office's website. *See* Request A Appeal, attached hereto as Exhibit N, at p. 1; *see also* Exhibits I, J, K and Exhibit L, p. 3.

34. OLC's release of information is internally inconsistent.

35. For example, a January 28, 1998 OLC memo concerning the application of 18 U.S.C. § 203 is available for public download (https://www.justice.gov/file/19731/download) from OLC' website, yet this memo is not listed on the OLC's list of opinions since 1998. Exhibit K.

36. Another example is the October 21, 2002 memo regarding the authorization for use of military force, which is absent from the list, yet is available in the electronic reading room. Exhibit K, Exhibit I, p. 5.

37. Given the office's long record of secrecy, and information we know is missing from the list and is inaccurate, there is no telling how many nonpublic records the office may have also inappropriately excluded from publication or release pursuant to FOIA.

### iv.   OLC Provides Executive Branch Interpretations

38. According to a July 16, 2010 internal OLC memo, "OLC's core function, pursuant to the Attorney General's delegation, is to provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government. In performing this function, OLC helps the President fulfill his or her constitutional duties to preserve, protect, and defend the Constitution, and to 'take Care that the Laws be faithfully executed.'" *See* OLC best practices memo, at p. 1, attached hereto as Exhibit O.

39. Furthermore, "…in rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain […] an agency's pursuit of desired practices or policy objectives." *Id.* p. 1.

40. OLC interprets the law for executive branch agencies and issues memos and opinions that those agencies should use as the foundation for policymaking and are in turn, expected to follow.

41. As the interpreter of law for the executive branch, the memos and opinions of OLC are of great worth and value to the public.

42. OLC is in possession of documents that will explain how the executive branch interprets authority on issues of national security and foreign affairs, specifically pertaining to military involvement and support.

43. The public should have a clear picture of the limits of government power, especially concerning military action funded by taxpayer dollars.

44. There is an increased need for transparency in national security and certain of OLC's withheld documents would provide the public with a better understanding regarding the legitimacy of U.S. military and national security actions.

45. The public has a right to understand the executive branch's views on the extent of executive power to conduct military operations and engage in use of force, including against top military and government officials of foreign nations.

46. The legal and policy basis for U.S. military operations has been previously disclosed to the general public during prior administrations, as seen by the release of the *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations*.[6]

---

[6]     See Just Security, "Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations," December 2016. https://www.justsecurity.org/wp-content/uploads/2016/12/framework.Report_Final.pdf

47.  Disclosure of the requested records will further the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government.

48. The requested records will highlight for the public how the executive branch interprets several applicable statute, regulation, and case law, including the Appointments Clause of the Constitution and the Federal Vacancies Reform Act.

49. Moreover, the requested records would provide information related to the transparency and oversight of the President's use of U.S. military forces, as defined under the War Powers Resolution. *See* February 24, 2020 War Powers and Presidential Practice article, at p. 1, attached hereto as Exhibit P.

50. On March 1, 2020 the President was to provide the public with any changes to the laws and policies governing his use of military force, and more than a month later, this information has not been released nor has an explanation ben offered as to the reason for the delay. *See* April 2020 Defense One article, at p. 1, attached hereto as Exhibit Q.

51. "In December 2017, the Republican-controlled Congress chose to make the framework report permanent. Specifically, it directed the Trump administration to update the report and then required that the president notify Congress within 30 days whenever there was a change in the legal and policy frameworks it describes." *Id.* It is in the public's interest to know why a congressional mandate is being disregarded, and the public has a right to know this information.

### v.      The "Torture Memos"

52.     On April 16, 2009, the Justice Department released four previously classified memos issued by OLC that provided legal guidance on the permissibility of the Central

Intelligence Agency's use of waterboarding and other illegal techniques used during the interrogation of high-ranking  Al Qaeda suspects. *See* ACLU article, attached hereto as Exhibit R.

53.     Three of the memos were written in 2005 by former OLC lawyer Steven Bradbury, and the fourth memo was written by Assistant Attorney General, Jay S. Bybee in August 2002. *Id.* p. 1.

54.     The memos, later known as the "Torture Memos" examined these techniques considering the prohibition against torture under the Convention Against Torture. 18 U.S.C. §§ 2340-2340A.

55.     According to the ACLU National Security Project Director, Jameel Jaffer's, press release:

> Memos written by the Office of Legal Counsel, including the memos released today, provided the foundation for the Bush administration's torture program…Through these memos, Justice Department lawyers authorized interrogators to use the most barbaric interrogation methods, including methods that the U.S. once prosecuted as war crimes. The memos are based on legal reasoning that is spurious on its face, and in the end these aren't legal memos at all – they are simply political documents that were meant to provide window dressing for war crimes. While the memos should never have been written, we welcome their release today. Transparency is a first step towards accountability.

Exhibit R, p. 1.

56.     ACLU staff attorney, Amrit Singh, went on to say:

> The documents released today provide further confirmation that lawyers in the Office of Legal Counsel purposefully distorted the law to support the Bush administration's torture program[.]…Now that the memos have been made public, high-ranking officials in the Bush administration must be held accountable for authorizing torture. We are hopeful that by releasing these memos, the Obama

administration has turned the page on an era in which the Justice
Department became complicit in some of the most egregious crimes.

Exhibit R, pp. 1-2.

### vi.    Posse Comitatus Act

57.    There is widespread and exceptional media interest and there exist possible

questions about the government's integrity, which affect public confidence.

58.    In the fall of 2018, the White House announced that military forces have been

authorized to use lethal force in support of the Department of Homeland Security and Customs

and Border Protection.

59.    Prior to this, active-duty military has served in a primarily supportive role,

however, this move "may run afoul of a 140-year-old law that generally bars the military from

operating within U.S. boundaries." *See* November 21, 2018 USA Today article, entitled, "White

House approves military to use lethal force at southern border," at p. 1, attached hereto as

Exhibit S.

60.    "Defense Secretary James Mattis confirmed the new guidelines to reporters on

Wednesday but downplayed the level of interaction his troops will have with migrants. He said

most troops aren't carrying weapons and that the military would stay away from civilian law

enforcement roles such as arrests, which are forbidden under in the Posse Comitatus Act." *Id.*

61.    The Posse Comitatus Act states that, "[w]however except in cases and under

circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any

part of the Army or Air Force as a posse comitatus or otherwise to execute the laws shall be

fined under this title or imprisoned not more than two years, or both." 18 U.S. C. § 1385.

62.    "These laws and regulations generally prohibit U.S. military personnel from direct

participation in law enforcement activities. Some of those law enforcement activities would

include interdicting vehicles, vessels, and aircraft; conducting surveillance, searches, pursuit and seizures; or making arrests on behalf of civilian law enforcement authorities. Prohibiting direct military involvement in law enforcement is in keeping with long-standing U.S. law and policy limiting the military's role in domestic affairs." *See* September 23, 2019 NorCom Memo, at p. 1, attached hereto as Exhibit T.

63.     This announcement, in addition to other ones, has drawn exceptional media interest to the subject of whether the President's recent order violates the constitution or statute.

64.     The clear separation of the military and domestic law enforcement duties is a core pillar of public confidence in both the military and the federal government, and should that separation be made less clear, it could easily affect public confidence in the government's integrity.

65.     This concern is further exacerbated by the fact that the President has made prior statements urging then-Attorney General Jeff Sessions to prosecute his political rivals, a politicization of federal law enforcement. *See* August 24, 2018 Roll Call article, entitled "*Trump Urges Sessions to Investigate His Political Foes*," at p. 2, attached hereto as Exhibit U.

### vii.     OLC's Duty to Support the Public Interest

66.     The records POGO requested concern the activities of OLC, the opinions and memoranda it issues and the role those opinions and memoranda play in directing executive branch a rulemaking and policy guidelines.

67.     If it is true that for various legitimate reasons, the content of certain opinions may need to be protected from immediate public disclosure, that legitimacy does not extend to the titles of said memos.

68.    The OLC's best practices memo reinforces not only the role its memos play in guiding executive branch policy, but also the importance of public disclosure.

> [T]he Office operates from the presumption that it should make its significant opinions fully and promptly available to the public. This presumption furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action. Timely publication of OLC opinions is especially important where the Office concludes that a federal statutory requirement is invalid on constitutional grounds and where the Executive Branch acts (or declines to act) in reliance on such a conclusion. In such situations, Congress and the public benefit from understanding the Executive's reasons for non-compliance, so that Congress can consider those reasons and respond appropriately, and so that the public can be assured that Executive action is based on sound legal judgment and in furtherance of the President's obligation to take care that the laws, including the Constitution, are faithfully executed.

Exhibit O, p. 5.

69.    OLC's opinions have been "instrumental in greenlighting numerous controversial—and, in some cases, arguably unconstitutional—policies and programs, including torture, warrantless mass surveillance, and drone strikes. Critically, many OLC opinions are never made public, or even made available to Congress." Exhibit L, p.2.

70.    There is significant public interest in knowing who is crafting the legal opinions that have the potential to change the course of our nation.

71.    Examples like the "torture memos" have had dramatic effects in American foreign policy as well as national security, both of which are well within the public's interest.

72.    According to *Int'l Bd. of Elec. Workers, Local No. 41 v. Dep't of Hous. & Urban dev.*, 763 F.2d 435, 436 (D.C. Cir. 1985), "The purpose of FOIA is to permit the public to decide for itself whether government action is proper[.]"

73.     It is easy to conceive of a situation where those who are shaping the direction of the nation are either not properly qualified to do so or are subject to conflicts of interest that might cause others to discount their professional judgement.

74.     The public takes great interest in the individuals who shape public laws, and it stands to reason that the public has a great interest as well in the individuals who shape what is commonly referred to as "secret law," especially given the lack of alternative oversight mechanisms.

75.     The disclosure of the names of OLC opinion authors can also give additional credibility and weight to their opinions, should they be properly qualified, reassuring the public that their trust is not being misplaced.

76.     It is in the public's interest to have confidence in the government and agencies should be held responsible for resolving internal inconsistencies. *See* ¶¶ 34-37 *supra.*

### viii.    OLC's Reliance on Exemption (b)(5) does not Outweigh Public Interest

77.     FOIA Exemption (b)(5) protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

78.     The Department of Justice has published a guide to understanding FOIA, and according to that guide, the three primary, most frequently invoked, privileges that have been held to be incorporated into Exemption 5 are the deliberative process privilege (referred to by some 14 courts as "executive privilege"), the attorney work-product privilege, and the attorney-client privilege. *See* Department of Justice Guide to the Freedom of Information Act excerpts, at page 359, attached hereto as Exhibit V.

79.     The general purpose of the deliberative process privilege is to "prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 151 (1975).

80.     This is based upon three policy purposes: "(1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) To protect against premature disclosure of proposed policies before they are actually adopted; and (3) To protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action." Exhibit V, p. 366.

81.     In order for the deliberative process to be invoked, "a document must be both (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which polices are formulated.'" *See United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000).

82.     The opinions and more specifically their dates and the titles, would have to meet the two-pronged test under FOIA; failure to do so would make the deliberative process privilege inapplicable:

> Under the District of Columbia Freedom of Information Act (FOIA), to qualify under deliberative process privilege, information must be both "predecisional" and "deliberative." A document is predecisional if it was prepared in order to assist an agency decision maker in arriving at his decision rather than to support a decision already made, and material is deliberative if it reflects the give-and-take of the consultative process. To ascertain whether the documents at issue are predecisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed. In ascertaining whether the documents are deliberative, the key question is whether disclosure of the information would discourage candid discussion within the agency. As a rule, to be deliberative, the document must reflect the personal opinions of the writer rather than the policy of the agency. Generally speaking, therefore, factual material that does not reveal the deliberative process is not protected by the privilege or the associated FOIA exemption. Thus, when material could not reasonably be said to reveal an agency's or

> official's mode of formulating or exercising policy-implicating judgment, the deliberative process privilege is inapplicable.

*See FOP v. District of Colombia*, 79 A.3d, 347, 355 (D.C. 2013)

83.     The titles of OLC opinions are not, by themselves, deliberative in nature, as they do not "reflect the personal opinions of the writer" and "factual material that does not reveal the deliberative process is not protected." *Id*.

84.     Furthermore, as Attorney General Michael Mukasey testified before House Judiciary Committee in 2008, "the Justice Department... could not investigate or prosecute somebody for acting in reliance on a Justice Department opinion," even if the advice contained in the opinion is wrong. *See* Testimony of Attorney General Michael Mukasey, before the House Judiciary Committee, on "Justice Department Oversight," February 7, 2008, at timestamp 02:12:34, available at https://www.c-span.org/video/?203946-1/justice-department-oversight&start=3435.

85.     Given that OLC opinions thereby effectively grant immunity from prosecution, it is clear that the opinions themselves are clear statements of established DOJ policy, and therefore cannot be deemed pre-decisional. In other words, they are "post-decisional."

86.     The titles are consistently of a factual nature and while they reveal the subject at hand, they do not reveal the nature of the deliberations or infringe upon the ability of the OLC to conduct its internal deliberations in an open and frank way.

87.     Disclosure of these titles could not result in any public confusion regarding the grounds for a decision, as no such grounds would be disclosed.

88.     Disclosure cannot be considered a "premature disclosure of a proposed policy," as the titles themselves do not generally propose policies. *Dudman Commc'ns Corp. v. Dep't of Air Force,* 815 F.2d 1565 (D.C. Cir. 1987).

89.     While the contents of any withheld OLC opinion may contain facts divulged by a client to his attorney, the title does no such thing.

90.     Furthermore, the titles are not generally based upon, nor do they generally reflect confidential facts conveyed by any potential clients of the OLC. The titles do not encompass any advice based on confidential facts supplied by a client, and thus do not run the risk of revealing facts that a client may have revealed in confidence. *Elec. Privacy Info. Ctr. v. DHS*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005); *MacLean v. DOD*, 2005 U.S. Dist. LEXIS 4042 at *4-6 (S.D. Ca. March 16, 2005).

91.     In the event that an OLC opinion is a binding determination, otherwise confidential records are not exempted, "Exemption 5 and the attorney-client privilege may not be used to protect... agency law from disclosure to the public." *See Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997).

92.     To the extent that an OLC opinion is binding, neither the title nor the contents of the opinion can be exempted under attorney-client privilege.[7]

93.     The government does not meet the requirements necessary in order to apply Exemption (b)(5) to the requested records and therefore OLC has an obligation to disclose this information to the public.

---

[7]     This principle was unanimously upheld by the Second Circuit Court of Appeals quite recently, when the OLC was forced to disclose not only the existence but also the contents of its memo regarding the targeting killing of Anwar al-Awlaki. *See* https://epic.org/amicus/foia/new-york-times/2d-Cir-Opinion.pdf

### ix.       OLC's Reliance on Exemption (b)(6) does not Outweigh Public Interest

94.       FOIA Exemption (b)(6) protects information in personnel and medical files and similar files when disclosure would constitute a clearly unwarranted invasion of personal privacy. *See* DOJ's FOIA Guide, 2004 Edition: Exemption 6 excerpt, attached hereto as Exhibit W.

95.       OLC's redactions of the authors of and dates of opinions do not rise to the level of the standards imposed by this exemption.

96.       There is significant public interest at stake in the disclosure of these records, as they pertain to the individuals who are effectively making legal decisions for the entire executive branch.

97.       The records sought do not constitute an unwarranted invasion of privacy as the records relate not only to professional and business activities, but also to individuals who hold a position of public trust recognized in the U.S. Constitution and implied loyalty to the U.S. government that inherently limits the privacy of the individual.

98.       OLC has previously disclosed the names of opinion authors, demonstrating that there is no inherent or categorical invasion of privacy in disclosing their identities.

99.       In response to a June 2018 FOIA request, OLC produced a heavily redacted list of opinions for 2017. *See* June 5, 2018 FOIA request and production, attached hereto as Exhibit X.

100.       In the 2018 list produced by OLC pursuant to the aforementioned request, ¶5 has the author of the January 20, 2017 opinion redacted subject to Exemption (b)(6), yet, that opinion was publicly available, in its entirety, including the signature block. Exhibit X, p. 3; *See also* January 20, 2017 OLC opinion, attached hereto as Exhibit Y, at pp. 1, 17.

101.    The redaction of the author's name has been inconsistently applied, given the OLC has published the full contents of certain memos while simultaneously using (b)(6) to redact names from titles in the currently available lists, and publicly available information cannot by definition be privileged.

102.    While individuals do not forfeit their privacy rights when they choose to work for the government, "their privacy interests are somewhat reduced," and they are reduced even further when the employee holds a high-level position. *Lissner v. Customs Serv.,* 241 F.3d 1220, 1223 (9th Cir. 2001); *Hardy v. Dep't of Def.,* 2001 U. S. Dist. LEXIS 26628 at *24 (D. Ariz. Aug. 27, 2001).

103.    The individuals who craft OLC opinions, which regularly determine the courses of action available to entire federal agencies, are most assuredly in high-ranking and influential positions and therefore have significantly reduced rights to privacy.

104.    The requested records relate to professional activities, and thus do not significantly impinge on personal privacy.

105.    "The privacy exemption does not apply to information regarding professional or business activities." *Cohen v. EPA*, 575 F. Supp. 425, 429 (D.D.C. 1983)

106.    The writing of OLC opinions is a clearly a professional activity, and "exemption 6 was developed to protect intimate details of personal and family life, not business judgements and relationships." *Sims v. CIA (I),* 642 F.2d 562, 575 (D.C. Cir. 1980).

107.    In the interest in keeping the public informed, the names of each opinion's author should be disclosed, because, "without more, the disclosure of a document will not constitute a clearly unwarranted invasion of personal privacy simply because it would invite a negative

reaction or cause embarrassment in the sense that a position is thought by others to be wrong or inadequate." *Schell v. Health & Human Servs.,* 843 F.2d 933, 939 (6th Cir. 1988).

108.     Unless it can be demonstrated that the publication of the authors' names would cause direct and palpable harm to the authors, there is no privacy invasion at all and no need for a balancing test against the public interest.[8]

## VI.     PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUESTS

### i.     Request A

109.     On October 1, 2018, POGO employee Daniel Van Schooten submitted a FOIA request via electronic mail to OLC which requested, "[a] list of all OLC opinions from January 1, 1998 through the present. Exhibit A, p. 1.

110.     On October 25, 2018, Mr. Van Schooten emailed OLC to request a status update, as the agency had one day remaining to comply with FOIA's 20-day response period. *See* POGO-OLC email chain, at p. 5, attached hereto as Exhibit Z.

111.     The OLC did not reply until 4 days later, when, on October 29, 2018, POGO received an acknowledgment letter for Request A and it was assigned the reference number FY19-001. *Id.*, p. 5; s*ee also* Request A Acknowledgment, attached hereto as Exhibit AA.

112.     The request was assigned to the "simple" processing track. Exhibit AA.

113.     Request A Acknowledgment also indicated that "[b]ecause of the considerable number of FOIA requests received prior to your request, our staff has not yet been able to process your request." *Id.*

114.     On April 18, 2019, OLC issued a final response to Request A. Exhibit J.

---

[8]     Note that exemption (b)(6) "does not apply to an invasion of privacy produced *as a secondary effect* of the release" (emphasis in original). *Arieff v. Dep't of Navy*, 712 F.2d 1462, 1468 (D.C. Cir 1983).

115.    The response yielded 22 responsive records, which were produced with redactions

pursuant to FOIA Exemptions (b)(5) and (b)(6). *Id*. p. 1.[9]

116.    OLC stated in the response that, "Although, as noted in your request, older versions

of many of these records were previously processed for release and are available on the OLC FOIA

Reading Room, we have fully re-reviewed and reprocessed the records for this request to ensure

disclosure of all nonexempt material. We have determined that none of the withheld material is

appropriate for discretionary release." *Id*. p. 1.

117.    In lieu of filing an appeal, on April 19, Mr. Van Schooten emailed OLC to seek

clarification about several discrepancies in the production. Exhibit Z, pp. 3-4.

118.    On April 26, OLC responded to Mr. Van Schooten's specific questions via email.

*Id.*, pp. 2-3.

119.    On May 1, Mr. Van Schooten sent another email to OLC concerning more

discrepancies, including those surrounding an August 2003 OLC opinion. *Id.*, pp. 1-2.

120.    OLC replied to Mr. Van Schooten via email and rather than fully respond to the

latest questions, OLC's representative Jared Kaprove stated:

> I have not attempted to determine whether the August 8 version was
> finalized, signed, or transmitted to a client, nor have I attempted to
> determine whether or to what extent the documents differ.
>
> Here, for this and any other discrepancies you may find as you
> continue reviewing the records, I think it's worth repeating the
> caveat from the FOIA reading room on the prior productions: while
> these lists are occasionally identified as responsive to FOIA requests
> and processed as such, they are created for internal tracking
> purposes and are not intended for public consumption as perfect and
> comprehensive lists of all OLC opinions.

Exhibit Z, p. 1.

---

[9]    As discussed in ¶100 *supra*, OLC one again produced a redacted list of 2017 opinions
with the same redaction of the author's name for the January 20 opinion. Exhibit J, p. 56.

121.     On May 9, 2019. POGO exercised its right to appeal OLC's response. Exhibit N.

122.     POGO's basis for the appeal was OLC's lack of a thorough search for responsive records.

> POGO was able to identify numerous responsive records that were not included in the list provided to POGO, but which the office has publicly posted on its website. Of the 41 records POGO identified, only 3 share a date with redacted entries in the records provided to POGO, indicating that this is primarily a failure to adequately search for responsive records.
>
> If the three redacted entries are in fact the same as the three public records that share their date of issuance, then POGO also appeals their redaction, as the office has already made the records public and therefore cannot reasonably assert that the redactions rise to the "foreseeable harm" standard established in the FOIA Improvement Act of 2016.

*Id*. p. 1.

123.     Moreover, POGO "…has identified several discrepancies related to the issuance dates of memos on the list the agency provided. In the identified instances, and likely in others, the records provided to POGO appear to contradict the records publicly available on the agency's public opinion database or its FOIA reading room." *Id*. p. 1.

124.     POGO requested that OLC "either correct the dates in the list provided or those the public records." *Id*. p. 2.

125.     On September 25, 2019, DOJ's Office of Information Policy sent letter to POGO regarding the appeal, which stated that:

> [a]fter carefully considering your appeal, and as a result of discussions between OLC personnel and this Office, I am remanding your request to OLC for a further search for additional responsive records. If OLC locates additional releasable records, it will send them to you directly[.]

Exhibit M.

Complaint
Page 23

126.    OLC sent a confirmation email to POGO on October 1, 2019 in response to a voicemail from Mr. Van Schooten verifying that OLC had indeed received the remand from the Office of Information Policy. Post-appeal emails, at pp. 3-4, attached hereto as Exhibit BB.

127.    POGO and OLC exchanged emails concerning a stipulation to redact responsive documents that fell outside of POGO's date range.  Exhibit BB, pp. 2-3.

128.    POGO has since sent 2 emails (December 4, 2019 and January 8, 2020) to OLC requesting a status update on the appeal and as of the date of this pleading, the question regarding the exact status of the quest remained unanswered. *Id.*, p. 1.[10]

129.     In the eleven months since POGO appealed, OLC has not provided updated documents, or an estimated date for production. Moreover, the closest OLC has come to offering any explanation for the withholding of information is stating in phone calls with Mr. Van Schooten that the approver, Jared Kaprove, is busy.

130.    Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for OLC's failure to disclose them.

### ii.    Request B

131.    On November 9, 2019, Mr. Van Schooten submitted a FOIA request via electronic mail to OLC which requested:

> 1.  Any OLC opinion or memorandum related to the legality and constitutionality of the appointment of Matthew Whitaker (or any Chief of Staff to the Attorney General) as Acting Attorney General.
> 2.  Any examination or analysis of potential recusal obligations for Matthew Whitaker.

---

[10]     Melissa Golden from OLC did send a reply to the December 5 email stating that she highly doubted that Mr. Kapgrove had even begun to review the materials. Exhibit BB, p. 1. Not only is this not an answer to the question, it is nothing more than third-party speculation on whether a status actually exists.

*See* Exhibit B, p. 1.

132.    The request was acknowledged by OLC on December 14, 2018 and assigned the

tracking number: FY19-034. *See* Acknowledgment of Request B, attached hereto as Exhibit CC.

133.    To date, POGO has received no additional correspondence from OLC regarding

this request.

134.    POGO's most recent attempt to get information related to this request was on

February 7, and no reply has been received. *See* Feb 2020 email, attached hereto as Exhibit DD.

135.    More than 30 business days have passed since Request B was sent to OLC.[11]

136.    Plaintiff POGO has a statutory right to the requested records, and there is no legal

basis for OLC's failure to disclose them.

### iii.    Request C

137.    On November 29, 2019, Mr. Van Schooten submitted a FOIA request via

electronic mail to OLC which requested:

> Any OLC opinions created after January 1, 2017, which include the
> term "posse comitatus" anywhere in the title or body or which
> include an analysis of the use of the armed forces to support the
> Border Patrol or Customs and Border Protection.

Exhibit C.

138.    The request was acknowledged by OLC on December 4, 2018 and assigned the

tracking number: FY19-057. *See* Request C Acknowledgment letter, attached hereto as Exhibit

EE.

---

[11]     All federal agencies have 20 business days to respond to a FOIA request. 5 U.S.C. §552 (6)(A)(i). Agencies can request an additional 10 business days to respond if there are unusual circumstances present. 5 U.S.C. §552 (4)(A)(viii)(II)(aa)

139.     To date, POGO has received no additional correspondence from OLC regarding this request.

140.     POGO's most recent attempt to get information related to this request was on February 7, and no reply has been received. Exhibit DD.

141.     More than 30 business days have passed since Request B was sent to OLC.

142.     Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for OLC's failure to disclose them.

### iv.     Request D

143.     On June 11, 2019, Ms. Mandy Smithberger submitted a FOIA request via electronic mail to the United States Department of Justice, Office of Information Policy ("OIP") which requested:

> 1.  Memorandum regarding "The Constitutional Separation of Powers Over Foreign Affairs and National Security" (Treanor/Koffsky) – 01/19/2001; and
> 2.  Memorandum regarding "The President's Authority to Provide Military Equipment and Training to Allied Forces and Resistance Forces in Foreign Countries" – 05/06/2003.

*See* Request D, p. 1.

144.     The request was received by OIP and assigned the tracking number DOJ-2019-005253. *See* December 2011 POGO-OLC emails, attached hereto as Exhibit FF.

145.     On July 1, 2019 OIP issued a final response to this request. *See* Final Response to Request D, attached hereto as Exhibit GG.

146.     In this letter, OIP informed POGO that the request was routed to OLC, OIP was closing the case and any further inquiries should be directed to OLC. *Id.*

147.    On July 29, 2019 OLC sent a letter to POGO acknowledging receipt of the request from OIP and assigned it the tracking number FY19-177. *See* Request D Acknowledgment letter, attached hereto as Exhibit HH.

148.    The request was assigned to the "simple track" and "[b]ecause of the considerable number of FOIA requests received by OLC prior to [POGO's…the] staff ha[d] not yet been able to process [the] request." *Id*.

149.    On December 11, 2019 POGO employee Lance Sims and OLC FOIA Specialist Melissa Golden exchanged emails about the status of Request D. Exhibit FF.

150.    To date, POGO has received no documents, no update and no additional correspondence from OLC regarding Request D.

151.    More than 30 business days have passed since Request D was sent to OLC.

152.    Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for OLC's failure to disclose them.

**v.      Request E**

153.    On June 11, 2019, Mr. Jake Laperruque submitted a FOIA request to OLC via the eFOIA portal which requested:

1.   Any documents produced or examined by the Office of Legal Counsel analyzing the legal basis for or any legal limitations on a targeted strike against Qasem Soleimani;
2.   Any documents produced or examined by the Office of Legal Counsel to determine to whether and to what extent a targeted strike on Qasem Soleimani would require Congressional authorization;
3.   Any documents produced or examined by the Office of Legal Counsel to determine whether a targeted strike on Qasem Soleimani was authorized by the 2002 Authorization for Use of Military Force;
4.   Any documents produced or examined by the Office of Legal Counsel to determine whether a targeted strike on Qasem

Soleimani was permitted solely by the President's authority pursuant to Article II of the Constitution; and

5. Any documents produced or examined by the Office of Legal Counsel to determine whether a targeted strike on Qasem Soleimani was authorized by the War Powers Act.

*See* Request E, p. 1.

154. The request was acknowledged by OIP on February 10, 2020 and assigned the tracking FY20-038. *See* Request E Acknowledgment letter, attached hereto as Exhibit II.

155. The request was tentatively assigned to the complex processing track. *Id.*

156. OLC indicated that because of the large number of pending requests, that the agency would not comply with the statutory deadline for responding to POGO's request, yet they did not provide an estimated date of completion. *Id.*

157. To date POGO has not received any further correspondence from OLC, including any production of documents, an indication of the volume of documents or an estimated date of completion.

158. More than 30 business days have passed since Request B was sent to OLC.

159. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for OLC's failure to disclose them.

## VII.   CAUSES OF ACTION

### COUNT 1
### Violation of the FOIA for Failure to make Promptly
### Available the Records Sought by Plaintiff's Requests

160. Paragraphs 1-159 are re-alleged and reincorporated herein by reference.

161. Plaintiff properly requested records within the possession, custody, and control of Defendants.

162.     Defendant's Failure to make promptly available the records sought by Plaintiff's

requests violates the FOIA, 5 U.S.C. § 552(a)(3)(A).

**COUNT 2**
**Violation of the FOIA for Failure to Timely Respond to Plaintiff's Requests**

163.     Paragraphs 1-162 are re-alleged and reincorporated herein by reference.

164.     Plaintiff properly requested records within the possession, custody, and control of

Defendants.

165.     Defendant's failure to respond timely to Plaintiffs' request violates the FOIA, 5

U.S.C. § 552(a)(6)(A)(i), and DHS' own regulation promulgated thereunder, 6 C.F.R. § 5.6(c).

**VIII.   PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, POGO, prays for the following relief:

a.   As to Count 1:
   i.   Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA requests;
   ii.   Order Defendant to provide a schedule of production to Plaintiff;
   iii.   Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;
   iv.   Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;
   v.   Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;
   vi.   Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and
   vii.   Grant such other relief as the Court may deem just and proper.

b.   As to Count 2:
   i.   Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA requests;
   ii.   Order Defendant to provide a schedule of production to Plaintiff;
   iii.   Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;
   iv.   Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;
   v.   Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

Complaint
Page 29

vi.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and

vii. Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 28th day of May, 2020.

By:      /s/Ross A. Nabatoff_____
Ross A. Nabatoff, DC Bar # 376665
LAW OFFICE OF ROSS A. NABATOFF
1440 G Street, N.W.
Washington, D.C.  20005
(202) 650-0037
*Attorney for Plaintiff*

Complaint
Page 30